COMPLAINT FILED UNDER SEAL – *QUI TAM* COMPLAINT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

UNITED STATES OF AMERICA, by and
through AGR GROUP, LLC, as Relator,

                                      Plaintiff

v.                                                      **Jury Trial Requested**

MATT HIRSCHBEIL, an individual.

                                      Defendant.

## COMPLAINT

RELATOR, AGR Group, LLC, by and through its counsel, Underhill Law, P.C., as relator for the United States of America, submits its Complaint for money damages and penalties arising out of the Defendant's violations of the False Claims Act.

### NOTICE REGARDING FILING UNDER SEAL

This is a *qui tam* action under the False Claims Act. 31 U.S.C. § 3730. Under that law, the Complaint must be filed under seal and remain sealed for sixty (60) days pending review by the United States of America. 31 U.S.C. § 3730(b)(2) ("The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders").

### STATEMENT OF THE CASE

1. Mr. Hirschbiel directed the submission of a fraudulent Payroll Protection Program (PPP) loan forgiveness application in the name of Mr. Ryan Scheeler, the true owner of AGR, Group. Mr. Scheeler had not reviewed, approved, or authorized the filing. Mr. Hirschbiel did this, and terminated Mr. Scheeler, to help cover up the fact that he had also directed another company, Canopy, to convert AGR Group's PPP funds for itself. As a result of the fraudulent forgiveness application, the government paid over $101,000.00 to the lender on the PPP loan.

COMPLAINT FILED UNDER SEAL – *QUI TAM* COMPLAINT

## PARTIES, VENUE, AND JURISDICTION

2. Plaintiff AGR Group, LLC, is a Nebraska limited liability company with a principal place of business located at 340 North 76th Street, Omaha, Nebraska, 68114.

3. Defendant Matthhew Hirschbiel is a Colorado resident residing at 820 South Harrison Street, Denver, Colorado 80209.

4. Mr. Hirschbiel is the managing member of Canopy Holdings, LLC and Canopy Holdings of Nebraska, LLC, collectively referred to as "Canopy" in this Complaint.

5. This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. § 1331 because the claims arise under the laws of the United States including 31 U.S.C. § 3730 and § 3732 and under 28 U.S.C. § 1345 because the United States of America is the beneficial Plaintiff.

6. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a). Mr. Hirschbiel is a Colorado resident.

7. Upon information and belief, Defendant is not incompetent or in the military service of the United States.

## GENERAL ALLEGATIONS

**A.   THE PAYCHECK PROTECTION PROGRAM.**

8. Congress added sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Section 1102 contains a new program called the Paycheck Protection Program ("PPP") and is party of the U.S. Small Business Administration's ("SBA") 7(a) Loan Program. These two sections are intended to provide economic relief to small businesses nationwide adversely impacted by the coronavirus pandemic and the COVID-19 Emergency Declaration issued by President Trump on March 13, 2020

9. Due to the COVID-19 emergency, many small businesses nationwide were experiencing economic hardship or the threat of the same as a direct result of the Federal, State, and local public health measures that are being taken to minimize the public's exposure to the coronavirus.

COMPLAINT FILED UNDER SEAL – *QUI TAM* COMPLAINT

10. The SBA received funding and authority through the CARES Act to modify existing loan programs and establish the new PPP loan program to assist small businesses nationwide adversely impacted by the coronavirus pandemic.

11. Section 1102 of the Act temporarily permitted the SBA to guarantee 100% of 7(a) loans under the PPP. Section 1106 of the CARES Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

12. The CARES Act was intended to provide relief to America's small businesses expeditiously.

13. The CARES Act gives lenders delegated authority to process loan applications for PPP funding. SBA allowed lenders to rely on certifications of the borrowers in order to determine eligibility of the borrower and use of loan proceeds, and to rely on specified documents provided by the borrower to determine qualifying loan amount, and eligibility for loan forgiveness. Lenders are held harmless for borrowers' failures to comply with PPP rules.

14. To be eligible for a PPP loan, among other things, the borrower must have been in operation on February 15, 2020 and had employees for whom the borrower paid salary. 85 FR 20811.

15. In order to obtain PPP loans, borrowers were required to make good-faith, self-certifications that they were eligible and that the loan request was necessary to support ongoing operations. 15 U.S.C. § 636(a)(36)(G)(i).

16. The SBA indicated in June of 2020 that the loans would be fully forgiven so long as they were in fact used to "retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments" and at least 60% of the proceeds went to payroll. *See Business Loan Program Temporary Changes; Paycheck Protection Program — Revisions to First Interim Final Rule*, 85 Fed. Reg. 36,308, 36,311 (June 16, 2020). The required percentage to be spend on payroll was later bumped up to 75%. 85 FR 20811.

17. The SBA permitted borrowers to use electronic signatures on PPP documents "regardless of the number of owners." 85 FR 20811.

18. To obtain forgiveness of a PPP loan, the borrower is required to submit a PPP Loan Forgiveness Application Form 3508S.

19. The individual signing the forgiveness application certifies that "The Borrower has complied with all requirements in the Paycheck Protection Program Rules (Sections 7(a)(36), (7)(a)(37), and 7A of the Small Business Act, the PPP interim final rules, and guidance issued by SBA through the date of this application), including the rules related to:

- eligible uses of PPP loan proceeds;
- the amount of PPP loan proceeds that must be used for payroll costs;
- the calculation and documentation of the Borrower's revenue reduction (if applicable); and
- the calculation of the Borrower's Requested Loan Forgiveness Amount.

20. The individual signing the forgiveness application also certifies that "The information provided in this application is true and correct in all material respects. I understand that knowingly making a false statement to obtain forgiveness of an SBA-guaranteed loan is punishable under the law, including 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a Federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

21. If a forgiveness application is approved, then the government remits to the lender an amount equal to the amount of the forgiveness plus any interest accrued through date of payment. CARES Act, Section 1106(c)(3)

B. **MR. HIRSCHBIEL GAINS CONTROL OF AGR GROUP OPERATIONS.**

22. AGR Group, LLC, is a Nebraska roofing company.

23. Ryan Scheeler is the majority managing member of AGR Group.

24. Around May of 2020, AGR Group was in discussions with Mr. Hirshbiel concerning a sale of the business.

25. Generally speaking, Mr. Hirschbiel proposed a "roll up" transaction by which AGR Group would sell its assets to another holding company or group of companies known as Canopy Holdings.

26. The physical operations of AGR Group would continue to operate after the sale and would continue to retain its earnings in the form of an "Earnout" which was supposed to consist of the Nebraska earnings by the former AGR Group systems minus Nebraska expenses.

27. AGR Group and Canopy entered into an Asset Purchase Agreement around January 22, 2021.

28. Under this agreement, AGR Group sold many of its assets to Canopy. Assets conveyed generally included those needed to carry on AGR Group's business in Nebraska, including contracts signed by not yet built, office spaces, and independent contractor and subcontractor agreements.

29. The sale specifically did not include PPP loan proceeds, bank accounts, insurance policies, and some other assets.

30. As to the Earnout, the Purchase Agreement stated that it would be calculated in the same manner as the parties had calculated the adjusted EBITDA (Earnings Before Income Tax, Depreciation, and Amortization) for calendar year 2019, less certain base salary and less "operational expenses" of Canopy "solely and directly related to the services provided by the Business acquired from" AGR Group.

31. As a consequence, even though AGR Group was selling its operations as assets, the operations would basically continue to operate as before, incurring the same payroll and other expenses and earning the same profits as before, just under a new corporate name. In essence, AGR Group temporarily became a department or subsidiary of Canopy.

32. Mr. Scheeler and Mr. Hirschbiel became the managing members of Canopy.

C.     THE SECOND ROUND PPP LOAN APPLICATION.

33. Around the time of the Asset Purchase Agreement, the federal government announced a second round of PPP funding.

34. Mr. Hirschbiel urged Mr. Scheeler to help him apply for a second round loan. Initially, Mr. Scheeler was skeptical. The Canopy entities were new companies without past payroll expenses in their own name to use to support a loan application.

35. Mr. Hirschbiel told Mr. Scheeler to seek a loan in AGR Group's name using AGR Group's own prior expenses.

36. Mr. Scheeler was not sure how the Asset Purchase Agreement would affect this application. Mr. Hirschbiel explained that it could not hurt to apply, and the worst that could happen was that the loan would not be given or would later not be forgiven.

37. Canopy was represented by corporate counsel at the time. Mr. Scheeler understood that Mr. Hirschbiel's instructions had been approved by corporate counsel. Based on this and on their prior trusted relationship, Mr. Scheeler went along with Mr. Hirschbiel's request and applied for the second round loan.

38. Mr. Scheeler filled out a second round PPP application for AGR Group sometime before March 22, 2021.

39. The application truthfully reported the payroll expenses of AGR Group in the prior months.

40. The second round PPP loan was approved in the amount of $101,322.64 and disbursed to AGR Group for payment of its employees and other appropriate expenses.

**D.     THE DEFENDANTS ABUSE THE PPP PROCEEDS AND FORGIVENESS.**

41. The Nebraska operations under the AGR Group umbrella had sufficient expenses in the form of payroll, utilities, and lease payments to show that all of the PPP money was spent on the appropriate categories.

42. But, AGR Group was not in control of the accounting and banking for its operations following the Purchase Agreement. Canopy was.

43. AGR Group and Mr. Scheeler assumed that the PPP funds were being paid out appropriately to keep employees retained and pay other appropriate expenses in Nebraska.

44. Around the beginning of 2022, though, Mr. Hirschbiel took the position that the PPP funds had not been used to support AGR Group's operations. Specifically, they claimed that the funds were the sole property of Canopy and would not be credited to AGR Group.

45. Mr. Hirschbiel, through a new CFO he had hired to support his position, argued that Canopy was entitled to seize the PPP funds under the Purchase Agreement and exclude it entirely from the calculation used for AGR Group's Earnout.

46. By doing this, Canopy used the profits of the Nebraksa operation, rather than the PPP funds, to pay the payroll, rent, and other expenses of AGR Group that were the purpose of the PPP loan.

47. Mr. Scheeler protested, telling the other managers of Canopy and corporate counsel that he suspected the seizure of the funds was fraudulent.

48. The other managers or counsel did not like this, told him he was wrong, and that he could not say things like that.

49. Shortly afterwards, Mr. Scheeler was terminated without cause and frozen out of the company.

50. Mr. Hirschbiel told Mr. Scheeler that the second round PPP loan had been forgiven.

51. This surprised Mr. Scheeler because he had not signed any forgiveness application.

52. Mr. Hirschbiel claimed the forgiveness was granted without the need to submit any paperwork

53. Mr. Scheeler was distracted with other issues at the time and did not investigate further.

54. Much later, Mr. Scheeler learned that in addition to seizing the PPP funds Defendants had defrauded the federal government by filing a fraudulent forgiveness application.

55. Around June of 2022, Mr. Scheeler asked the lending bank about the forgiveness application. Since he had signed the original application, the bank showed him the paperwork.

56. Mr. Scheeler was shocked to find that Defendants had submitted a forged forgiveness application in Mr. Scheeler's name.

57. Mr. Scheeler's name appeared on the transaction in a signature apparently created with an italic computer font.

58. Mr. Scheeler had not seen the document, approved it, or signed it.

59. For contact information, Canopy used ShelbyPowell@agr-mw.com rather than Mr. Scheeler's e-mail address, ensuring that communications would go to another Canopy employee and not to Mr. Scheeler.

60. Ms. Powell was an employee of Canopy who answered to Mr. Hirschbiel.

61. Ms. Powell would not have submitted the document without Mr. Hirschbiel's direct instructions.

62. The forgiveness form represented that the "Borrower[,]" identified as AGR Group, had complied with all requirements in the PPP rules. It claimed that Mr. Scheeler was the principal of the business and did not reveal Canopy's involvement in the process.

63. The form did not disclose that Canopy had kept the PPP funds for itself, but instead claimed the funds had been spent on AGR Group's employees. This was contrary to what Mr. Hirschbiel claimed in connection with the Earnout.

64. Mr. Scheeler reported his concerns with the fraudulent forgiveness application to the lending bank.

65. The bank representative explained that the bank did not review backup documents for forgiveness applications over such small amounts, and that AGR Group needed to report its concerns directly to the SBA.

66. AGR Group then did so, filling out a form reporting the fraudulent forgiveness application submitted without his authority to the SBA using an on-line form or website.

67. Upon information and belief, based on Section 1106 of the CARES Act, the SBA or federal government paid the lender over $101,000.00 as a result of the fraudulent and forged forgiveness application.

68. Upon information and belief, there is no prior *qui tam* action under the False Claims Act currently pending against Mr. Hirschbiel.

69. Upon information and belief, there is no prior disclosure of Mr. Hirschbiel's forged application except as made by AGR Group.

70. The factual background of this action is similar to the background in a related civil lawsuit pending between AGR Group, Mr. Hirschbiel, and others, but all information related to the PPP loan in that case was only made public by the actions of the Relator in this case.

71. The related case concerns a business dispute and is currently removed to this Court and is known as *Scheeler, et al. v. Canopy Holdings, LLC, et al.*, United States District Court for the District of Colorado Case No. 1:222-cv-02417. As of the filing of this Complaint, the plaintiffs there are moving to remand the case to state court for further proceedings.

**FIRST CLAIM FOR RELIEF**
**False Claims Act – 31 U.S.C. § 3729**

72. Relator incorporate all other averments of this Complaint as if set forth here.

73. Defendant presented or caused to be presented false or fraudulent claims to the United States Government, or authorized agent of the United States Government, for payment or approval.

74. Defendant knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

75. Defendant conspired to commit the acts described above or directly participated in the act.

76. These included, at a minimum: (1) a forged signature from Mr. Scheeler; (2) a false statement that the PPP funds had been spend on AGR Group's payroll when it actually had been seized by Canopy without AGR Group's consent.

77. Relator cannot at this time identify all of the false claims for payment that were caused by Defendant. The false claims were presented to third party lending institutions.

78. Upon information and belief, the Lenders and the Government were unaware of the falsity of the records, claims, and statements.

79. Upon information and belief, the Government paid the lender to forgive the second round PPP loan. This payment would not have been paid but for ignorance of Defendant's illegal conduct.

80. As a result of Defendant's illegal actions, the Government has been damaged in an amount to be determined at trial.

81. Additionally, the Government is entitled to a maximum penalty of up to $11,000.00 for each and every violation arising from Defendant's illegal conduct.

82. Relator seeks treble damages and penalties as permitted by the False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

## PRAYER FOR RELIEF

Relator seeks the following relief:

DAMAGES to be established at trial but to include three times the damage that the United States has suffered because of Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000 for each violation of 31 U.S.C. § 3729 and any interest allowed by law; and

AN AWARD to Relator in the maximum amount allowed under 31 U.S.C. § 3730(d), attorney fees, and costs.

## RIGHT TO AMEND

Relator respectfully reserves the right to amend this Complaint as additional or supplemental facts and information become known or for any other reason.

## JURY DEMAND

Relator demands a trial by jury on all claims, defenses, and issues in this dispute.

DATED: October 14, 2022

**UNDERHILL LAW, P.C.**

*/s/Colin Moriarty*
Colin E. Moriarty, #36865
Underhill Law, P.C.
7350 East Progress Place, Suite 110
Greenwood Village, Colorado, 80111
Telephone: (303) 721-7112
Email: Colin@UnderhillLaw.com

**COUNSEL FOR RELATOR**